UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NAJAS REALTY, LLC and           )
PETRA BUILDING CORP.,           )
                                )
            Plaintiffs,          )
       v.                       )
                                )          CIVIL ACTION
THE SEEKONK WATER DISTRICT,     )          NO. 13-11882-JGD
ROBERT BERNARDO individually and )
in his capacity as Superintendent of the )
Seekonk Water District, and     )
JOHN DOES 1-10, JANE ROES 1-10 and )
XYZ CORPORATION 1-10,           )
                                )
            Defendants.          )

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS'
MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

December 23, 2014

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of the opposition of the defendants, the Seekonk Water

District ("SWD") and its Superintendent, Robert Bernardo ("Bernardo"),[1] to the develop-

ment by the plaintiffs of a 10 acre parcel of land in Seekonk, Massachusetts known as the

Pine Hill Estates.  The plaintiffs contend that in retaliation for their having outbid the

---

[1]  The plaintiffs have alleged, "upon information and belief," that the unidentified
individual and corporate defendants "have aided, assisted, and/or conspired with the other above-
named defendants with respect to the Constitutionally and/or legally violative conduct described
in this Amended Complaint."  (Compl. ¶ 5).  Absent any details about them, they will not be
considered further.

defendants for the property, the defendants maliciously and baselessly opposed the development, citing unfounded concerns about the nitrate levels in the town's drinking water supply. Despite this opposition, the Project was eventually approved. Nevertheless, the plaintiffs have brought a 15 count complaint alleging violations of their federal and state constitutional rights, as well as common law claims.

The defendants have moved for partial judgment on the pleadings on the grounds that the plaintiffs have failed to allege a violation of their constitutional rights to petition government (Counts I & II), their rights of free speech (Counts III & IV), their rights to equal protection (Counts X & XI),[2] and their substantive due process rights (Counts XII and XIII). In addition, Bernardo contends that he is entitled to qualified immunity from suit in his individual capacity for all civil rights violations pleaded against him (Counts I-IV, X-XIII), and common law immunity for speaking on matters of public concern as the Water District Superintendent, which precludes the maintenance of a claim for intentional interference with advantageous business relations against him (Count XV). Finally, the defendants contend that the plaintiffs have failed to state any claims against the Water District pursuant to 42 U.S.C. § 1983.

For all the reasons detailed herein, the defendants' motion for judgment on the pleadings is ALLOWED. This case falls within the principle that "[t]he Civil Rights Act

---

[2] Simultaneously with opposing the motion for judgment on the pleadings, the plaintiffs moved to amend their Complaint for a second time, alleging additional facts concerning their equal protection claims. The motion to amend is opposed, and will be addressed herein as well.

cannot be used as a rack upon which every disappointed developer can stretch a community that fails to roll out the red carpet for him." Chongris v. Board of Appeals of the Town of Andover, 811 F.2d 36, 46 (1st Cir. 1987).

## II. STATEMENT OF FACTS[3]

### Scope of the Record

The defendants are seeking judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). The legal standard for evaluating a motion for judgment on the pleadings is essentially the same as the standard for evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), except that a Rule 12(c) motion "implicates the pleadings as a whole." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54-55 (1st Cir. 2006). Therefore, the court must "view the facts contained in the pleadings in the light most flattering to the nonmovants (here, the plaintiffs) and draw all reasonable inferences therefrom in their favor." Id. at 54. "The court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (quoting R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006)). Applying this standard, the relevant facts are as follows.

---

[3] Unless otherwise indicated, the facts are derived from the Amended Complaint filed on December 18, 2013 (Docket No. 32) ("Compl."), the defendants' Answer thereto (Docket No. 34) ("Ans.") and the undisputed minutes of meetings attached to the plaintiffs' Opposition to the Motion for Judgment on the Pleadings (Docket No. 49-1).

**Pine Hill Estates**

Najas Realty, LLC and Petra Building Corporation are Rhode Island entities owned principally by Steven Najas (collectively, "Najas" unless otherwise indicated). (Compl. ¶¶ 1-2). Najas Realty is a real estate development and property holding company, while Petra is a home building company. (Id. ¶¶ 8-9). The Seekonk Water District is an independent governmental entity chartered by the Massachusetts Legislature in 1946. (See id. ¶ 3; Mass. St. 1945, c. 381). It is charged with ensuring and maintaining safe drinking water for the Town of Seekonk. See Mass. St. 1945, ch. 381, § 1. A three-member Board of Water Commissioners oversees the policy and procedural issues of the Water District. Id. §§ 2, 9. Day-to-day operations are managed by the defendant Robert Bernardo, Superintendent of the Seekonk Water District. Id. § 11; see generally Seekonk Water District "Rules & Regulations." Bernardo is being sued in both his individual and official capacity. (Compl. ¶ 4).

In or about early 2012, Najas purchased a ten acre parcel of land in Seekonk, Massachusetts, known as the Pine Hill Estates Property for the purpose of building a 10-lot residential subdivision on the site. (Id. ¶¶ 10-11, 17). In purchasing the Property, Najas outbid Bernardo (in his capacity as the Seekonk Water Superintendent) and the Seekonk Water District. (Id. ¶ 12-14).[4] As detailed in the meeting minutes supplied by

---

[4] According to the defendants, public records demonstrate that the Seekonk Community Preservation Committee ("CPC"), and not the Water District, was the competing bidder for the Property, using a combination of Community Preservation Act funds and state grant money. (Defs. Mem. (Docket No. 37) at 6 n.6). The defendants supported the CPC's purchase (as

the plaintiffs in opposition to the motion for judgment on the pleadings (Docket No. 49-1), the Seekonk Water District opposed any development of the Pine Hill Estates Property on the stated grounds that development could result in an increase in the nitrate levels of the town's drinking water. (See id. at 6-8). A nearby middle school was under monitoring obligations imposed by the Department of Environmental Protection ("DEP") due to the level of nitrates in the water. (Id. at 18-19; Compl. ¶¶ 20-21). Thus, the defendants' desire to purchase the property was to prevent any development, not to develop the Property for their own purposes.[5]

The plaintiffs allege generally as follows:

> 15. Following Najas's purchase of the Pine Hill Estates Property, the Water District, lead by Bernardo, engaged in a retaliatory campaign of harassment, intimidation, abuses of governmental power, defamation and tortious interference with Najas's business and contractual interests and relations, which were designed to interfere with and ultimately destroy its business and reputation.

> 16. Such action by Bernardo and the Water District was designed to punish Najas for outbidding them in purchasing the Pine Hill Estates Property, to punish Najas for taking efforts to develop the Pine Hill Estates Property, and to coerce Najas to abandon the Pine Hill Estates Project ..., all in violation of its Constitutional, statutory and other legal rights.

---

opposed to the plaintiffs' purchase) due to their concern that development would threaten the Town's drinking water supply. (Id.).

[5] Although the plaintiffs argue in opposition to the pending motion that Bernardo and the Water District wanted the property "for their own business interests" there is no such allegation in the Complaint. (See Pls. Opp. (Docket No. 49) at 14 (citing Compl. ¶¶ 15-16)). Rather, all the minutes on which the plaintiffs rely indicate that the defendants wanted the property to remain undeveloped if possible.

(Compl. ¶¶ 15-16).  In particular, the plaintiffs object to the following actions and statements.

An initial meeting regarding the Pine Hill Estates Project was held by the Seekonk Board of Health on April 25, 2012.  (Id. ¶ 20).  Bernardo appeared and expressed concerns about the Project's proximity to one of the Town's public water supply wells known as GP-4.  (Id.).  "According to Bernardo, the soils in the vicinity of the GP-4 well had elevated levels of nitrates due to the malfunctioning of a large septic system that services the Town's Hurley Middle School (which is located adjacent to such well)."  (Id. ¶ 21).  Bernardo presented graphs about the Middle School's system at the meeting, which indicated rising levels of nitrates that frequently exceeded acceptable limits.  (Docket No. 49-1 at 6).  These levels existed despite the School's "FAST" system, which was designed to regulate nitrates.  (Id.).  The plaintiffs also intended to use a FAST system at the development.  (Id. at 18).  The plaintiffs contend that Bernardo's statements about the nitrate levels were "unsubstantiated and baseless."  (Compl. ¶ 31).

Bernardo continued his discussion with the Board of Health after Mr. Najas and his representatives had left, and expressed his opposition to the development.  Bernardo told the Board of Health that he "would like this guy to go away" and that the Board of Health should make the developer "jump every hurdle" in regard to the Pine Hill Estates Project.  (Id. ¶ 26).  A number of members of the Board of Health discussed concerns about the impact of the Project on the town's water supply because "[t]he water in the ground is essential[.]"  (Docket 49-1 at 8-11, 18-22).  The Board discussed which agen-

cies were involved in approving the Project, and were responsible for making sure that the nitrate levels were acceptable. (Id. at 19). The Board members also expressed the sentiment that as long as the developer "go[es] by the letter of the law they can do what they want." (Id. at 19).

According to the plaintiffs, as a result of the Water Department's concerns, the Board of Health and Seekonk Health Department required the plaintiffs to perform a costly "nitrate loading analysis" as part of the definitive plan submission. (Compl. ¶ 22). After the plan was submitted, the Board of Health held another meeting to discuss the Pine Hill Estates Project and its concerns over nitrates. (Id. ¶ 28). At the meeting, held on September 12, 2012, the Board of Health voted to request a joint meeting with the Board of Selectmen and the Water District. (Id. at ¶ 29). According to the plaintiffs, such action was "unprecedented." (Id.).

The Board of Selectmen held a meeting on September 19, 2012, at which Bernardo again urged the Board to reject the Pine Hill Estates Project. (Id. ¶¶ 30, 34). Bernardo again repeated the allegations (which the plaintiffs dispute) that there were increased levels of nitrates in the vicinity of the GP-4 well due to a malfunctioning septic system at the Town's Hurley Middle School. (Id. ¶ 31). Bernardo also stated that increased nitrates from the development "could lead to significant health issues of the public in Seekonk, including but not limited to the risk of pregnant or nursing mothers having their infant children contract 'Blue Baby Syndrome,' a severe medical condition that causes infants to asphyxiate." (Id. ¶ 32). The plaintiffs characterize these statements as being

"unsupported by fact [or] law' and "completely baseless." (Id. ¶ 33). However, the EPA has set maximum contaminant level goals for nitrates in drinking water pursuant to the Safe Drinking Water Act. As stated on the EPA website:

> Infants below six months who drink water containing nitrate in excess of the maximum containment level (MCL) could become seriously ill and, if untreated, may die. Symptoms include shortness of breath and blue baby syndrome.

See http://water.epa.gov/drink/contaminants/basicinformation/nitrate.cfm.

A meeting was held on September 20, 2012 among members of the Board of Selectmen, the Board of Health, the Water Board, Bernardo and an engineer hired by the Water District. (Compl. ¶ 35). Bernardo repeated his and the Water District's concerns about the proposed Project. (Id. ¶ 36). Thereafter, Najas' special nitrate loading analysis was completed, and was discussed at a Board of Health meeting on November 14, 2012. (Id. ¶¶ 37-38). Najas' analysis purported to establish that the nitrate levels at the property were within regulated limits, and the Board of Health voted to approve the nitrate loading analysis and the Pine Hill Estates Project. (Id. ¶¶ 39-40).

A Planning Board meeting was held on December 11, 2012. (Id. ¶ 41). According to Najas, although the Planning Board's engineer had not expressed any concerns about potential groundwater contamination, a member of the Planning Board had published an article in the local newspaper expressing concern about the effects of nitrates in the public water supply. (Id. ¶¶ 42-44). Furthermore, Bernardo appeared at the Planning Board meeting, challenged Najas' engineer's conclusions, and opposed the Project. (Id.

¶¶ 45, 48).  Bernardo expressed the same concerns as before, and argued that a clean-up of nitrates could cost over a million dollars.  (Id. ¶¶ 46-48).  The Planning Board voted to continue the meeting until January 22, 2013, at which time it voted 4-3 to deny the Pine Hill Estates Project.  (Id. ¶¶ 49-50).

Najas appealed the Planning Board's denial to the Massachusetts Land Court pursuant to Mass. Gen. Laws ch. 41, § 81BB.  (Id. ¶ 51).  The parties settled the case, with Najas reducing the number of lots from 10 to 9, and agreeing to shorten the roadway length.  (Id. ¶ 52).  A public hearing was held on March 12, 2013 on the revised plan. (Id. ¶ 53).  Although Bernardo opposed the plan, the Planning Board approved the revised plan.  (Id. ¶¶ 54-56).  No party appealed.  (Id. ¶ 57).

The Water District then filed a petition to rescind and/or modify the Pine Hill Estates Project with the Planning Board, as authorized by Mass. Gen. Laws ch. 41, § 81W.  (Id. ¶ 58).  Bernardo and the Water District engaged in a campaign to convince the public of what Najas contends are baseless potential health problems and clean-up costs if the Project was approved.  (Id. ¶¶ 59-63).  Despite the defendants' extensive campaign, the Planning Board denied the Water District's petition to rescind.  (Id. ¶ 64). The Water District attempted to appeal the denial to Bristol Superior Court, but apparently the matter was dismissed.  (Id. ¶ 65; see Defs. Mem. (Docket No. 37) at 8-9).  In October 2013, the Water District granted permission for the Pine Hill Estates subdivision to connect to the Seekonk water supply.  (Id. at 9).  Najas contends that as a result of the defendants' "actions and statements" the plaintiffs have lost sales on previously reserved

lots, and lost "future contracts for construction of single family homes on those same lots." (Compl. ¶ 66).

## Orchard Estates

While the plaintiffs' primary objection is to the handling of their proposal to develop the Pine Hill Estates, they also object to the way their application for another Project was handled by the Seekonk Water District. Specifically, Najas owns a 14 acre parcel in Seekonk on which the plaintiffs intend to construct an 8-lot conservation subdivision known as "Orchard Estates." (Id. ¶ 68). The Project was approved by the Planning Board in June 2012, but then Bernardo and the Water District required Najas to "loop" the water line that would service the Project, instead of allowing the line to "dead end." This allegedly added tens of thousands of dollars to the cost of the development unnecessarily. (Id. ¶¶ 70-78). In addition, the plaintiffs contend that Bernardo delayed several months before explaining that Najas' proposal to "dead end" the line would not be acceptable due to "water quality" concerns, as a result of which it was too late in the year to begin construction on the Project, causing the plaintiff additional financial harm. (Id. ¶¶ 75-79). This treatment was also allegedly in retaliation for Najas having outbid the Water District for the Pine Hill Estates Property.

Additional facts will be provided below where appropriate.

## III. ANALYSIS

### A. Standard of Review

"The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is essentially the same as that for deciding a Rule 12(b)(6) motion." Pasdon v. City of Peabody, 417 F.3d 225, 226 (1st Cir. 2005). Thus, the court must accept as true all well-pleaded facts and draw all reasonable inferences in favor of the non-moving party. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007); Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999). Dismissal is appropriate only if the pleadings, so viewed, fail to support "'a plausible entitlement to relief.'" Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 559, 127 S. Ct. at 1967).

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief. Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). "'First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' Such conclusory statements are 'not entitled to the assumption of truth.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)) (internal citation omitted). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.'" Id. (quoting Iqbal, 129 S. Ct. at 1950). "This second principle recognizes that the court's assessment of the pleadings is 'context-specific,' requiring 'the reviewing court to draw on its judicial experience and common sense.' '[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief.'" Id. (quoting Iqbal, 129 S. Ct. at 1950) (internal quotations and citation omitted; alternations in original).

Applying these principles to the instant case compels the conclusion that the defendants' motion for partial judgment on the pleadings be ALLOWED.

## B.    Right to Petition Government and Right to Free Speech

In Counts I-IV of the Amended Complaint, Najas alleges that the defendants retaliated against the plaintiffs for exercising their First Amendment rights "to petition the government for redress" (Counts I and III) and of free speech (Counts II and IV), in violation of federal and state constitutions.[6]  For the reasons detailed herein, these counts must be dismissed.

"A claim under [42 U.S.C.] section 1983 has two essential elements.  First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997).  It is undisputed that Bernardo was acting at all relevant times under color of state law.  Thus, this court's

_____

[6]  The plaintiffs' federal claims are brought pursuant to 42 U.S.C. § 1983, and their state claims allege a violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H-11I.  Since the parties agree that for present purposes the scope of protection is the same under the federal and state constitutions, no separate state law analysis is necessary.  See generally Caswell v. Licensing Comm'n for Brockton, 387 Mass. 864, 871-72 & n.5, 444 N.E.2d 922, 927 & n.5 (1983); Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 227 (D. Mass. 2002) (constitutional analysis the same, although Massachusetts Civil Rights Act has the additional requirement that the interference or attempted interference with the exercise of constitutional rights be "by threats, intimidation or coercion").

inquiry must focus on whether the plaintiffs' allegations support a claim that the defendants deprived them of their constitutional rights.

As a general statement, "[c]laims of retaliation for the exercise of First Amendment rights are cognizable under [42 U.S.C.] § 1983." Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004). The First Amendment protects freedom of speech, as well as "the right to petition all branches of the government, including the courts." Id. (and authorities cited).[7] "To make out a First Amendment retaliation claim, the plaintiff must show that his conduct was in fact constitutionally protected[,]" and that there was "a causal connection between the allegedly protected speech and the allegedly retaliatory response." Goldstein v. Galvin, 719 F.3d 16, 30 (1st Cir. 2013) (internal quotations and citations omitted). "Causation is established by showing that the plaintiff's conduct was a 'substantial' or 'motivating' factor in bringing about the allegedly retaliatory action." Id.

As an initial matter, the law is unclear as to whether the plaintiffs' conduct in seeking applications for building development constitutes "petitions for redress of grievances" which are protected by the First Amendment. Compare Hampton Bays Connections v. Duffy, 127 F. Supp. 2d 364, 373 (E.D.N.Y. 2001) (in a case of first impression court concludes that "applying to a town planning board or similar entity for

_____

[7] The First Amendment provides that "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances." U.S. Const. amend. I.

special use exception permits, site approval plans, or building permits is conduct pro-

tected the First Amendment right to petition government for the redress of grievances")

with WMX Techs, Inc. v. Miller, 197 F.3d 367, 372 (9th Cir. 1999) ("application for a

major use permit is not equivalent to a petition to the Government for redress of

grievances under the First Amendment").  That issue, however, does not need to be

resolved here.  A most liberal reading of the Complaint fails to establish that the

defendants engaged in unconstitutional retaliatory conduct.

In the instant case, the alleged "retaliatory conduct" engaged in by the defendants

involved opposing the Pine Hill Estates Project through legal means.  Bernardo chal-

lenged the potential increase in nitrate levels caused by the development, and cautioned

that increased levels could result in "blue baby syndrome" and/or millions of dollars in

clean up costs.  Despite the plaintiffs' allegations that the defendant's comments were

factually unsupportable, the record before this court establishes that the health risks and

clean-up costs were potentially real if, in fact, the development caused nitrate levels to

increase above those recommended by the EPA.  "Blue baby syndrome" was not a

phantom concern of the defendants, but rather was recognized by the EPA as a real risk in

the event of increased nitrate levels.  Since it is undisputed that the Middle School in the

area of the proposed Project was being monitored for nitrates pursuant to an order of the

DEP, the pleadings do not support a finding that the defendants' concern with nitrate

levels was frivolous.  Thus, while the defendants may, or may not, have been correct

about the actual impact that the Pine Hill Estates might have on the town's drinking

water, Bernardo was acting within the scope of his responsibilities as Superintendent of the Water District when he raised his concerns.[8]

As a general statement, "[c]ourts have not been receptive to retaliation claims arising out of government speech." Goldstein, 719 F.3d at 30, and cases cited. "This cautious approach to limiting government speech is warranted. Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern." Id. Here, the defendants voiced their opposition to the Project through regular channels and in public fora. The plaintiffs were able to publicly challenge the defendants' analyses, and were obviously successful in convincing the decision-making Boards of their positions, since the permits were issued and the Pine Hill Estates Project was approved. It is well-established that "full participation by persons

_____

[8] This court has considered the alleged "recently discovered" facts relied on by the plaintiffs in their Supplemental Memorandum of Law in Support of their Motion for Leave to File a Second Amended Complaint (Docket No. 55-1) relating to actual nitrate levels in Seekonk's drinking water, and communications sent by Bernardo. This information does not alter this court's conclusion that the plaintiffs' First Amendment claims must be dismissed. Even assuming, arguendo, that information about the nitrate levels in the town's drinking water eight years before and two years after the meetings at issue is properly before this court and is at all relevant, the fact that the town's water was within EPA guidelines does not make the defendants' concerns about nitrate levels in the event of new development frivolous. Nor do the random emails cited by the plaintiffs alter the conclusion that the defendants (1) wanted to stop development of the Project (consistent with their stated goals), and (2) used lawful processes in their attempt to do so. Furthermore, the plaintiffs still have not put forward any facts to support their conclusion that the defendants "singled out Plaintiffs due to malicious personal motives." (Docket No. 55-1 at 4). In any event, personal animosity is not sufficient to establish a constitutional violation. See Goldstein, 719 F.3d at 31 (quoting The Baltimore Sun Co. v. Ehrlich, 437 F.3d 410 (4th Cir. 2006) ("of course, a public official's malicious intent, taken alone, cannot amount to a retaliatory response")). Thus, this allegedly "new information" does not affect the conclusion that the plaintiffs have failed to state a claim.

and organizations and robust discussion of issues before legislative, judicial, and

administrative bodies and in other public fora are essential to the democratic process[.]"

Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 161, 691 N.E.2d 935, 939

(1998) (discussing legislative purpose behind Mass. Gen. Laws ch. 231, § 59H

prohibiting SLAPP suits).  In this case, the plaintiffs have failed to allege that the

defendants did anything more than force them to fully justify the Pine Hill Estates Project

before it was approved, in the face of opposition that the plaintiffs felt was groundless.

This is insufficient to state a claim for unconstitutional retaliation.  As the court held in S.

Middlesex Opportunity Council, Inc. v. Town of Framingham, No. 07-12018-DPW, 2008

WL 4595369 (D. Mass. Sept. 30, 2008), in language equally applicable here:

> the First Amendment interests at issue in this case are arrayed on
> both sides of the public discourse regarding [the development
> project].  The Complaint makes clear that the Defendants viewed the
> Plaintiffs' requests and activities as a matter of public concern.  The
> public discourse about this matter involved not only participation by
> the Plaintiffs, but also by members of the Planning Board, Board of
> Selectmen, and the Town Meeting.  To suggest that the Plaintiffs'
> activities are shielded by the First Amendment, but that the Defen-
> dants' activities are prohibited by that same constitutional rule,
> would allow the Plaintiffs to use the First Amendment both as a
> shield and as a sword.  See Brandywine-Main Line Radio, Inc. v.
> F.C.C., 473 F.2d 16, 62 (D.C. Cir.1972) ("The first amendment was
> never intended to protect the few while providing them with a
> sacrosanct sword and shield with which they could injure the
> many.").  I will therefore dismiss so much of the § 1983 claim as is
> based on the First Amendment.

Id. at *19 (where defendants' opposition "involved public hearings, legal discussions

among governmental bodies, and internal debates about the Plaintiffs' applications," their

opposition did not rise to the level of unconstitutional retaliation).[9]  Accordingly, Counts I-IV of the Amended Complaint will be dismissed in this case as well.

## C.    Equal Protection

In Counts X and XI of the Amended Complaint, the plaintiffs allege that the defendants violated their Fourteenth Amendment constitutional rights to equal protection by treating the Pine Hill Estates Project differently than other projects in the Town.  In addition, the plaintiffs have moved to amend their Complaint to add further details about allegedly comparable developments.  (Docket No. 50).  Because this court concludes that, as amended, the Complaint still fails to state an equal protection claim, the motion to amend will be denied as futile and the motion to dismiss Counts X and XI of the Amended Complaint will be allowed.

"Because [Najas] contends that the government singled him out for differential treatment for reasons unique to him, rather than because of his membership in any group, his equal protection claim is of the 'class of one' variety."  Snyder v. Gaudet, 756 F.3d

---

[9]  While the Pine Hill Estates Project is clearly the focus of the plaintiffs' Complaint, they also challenge the fact that the Water District required Najas to "loop" the water line that would service Orchard Estates, and the length of time it took to impose that requirement.  (See Compl. ¶¶ 68-79).  As detailed in the Complaint, the method of providing water to the proposed subdivision was within the authority of the defendants.  There were discussions and meetings about whether the line was to be "dead ended" or "looped."  (Id.).  The fact that the defendants elected to require "looping" at an increased cost to Najas because of alleged water quality concerns that the plaintiffs feel were unwarranted does not rise to the level of a constitutional violation.  To paraphrase the Goldstein court, "[a]llowing a plaintiff to weave a First Amendment retaliation claim out of something so mundane as a government official's issuance of [an appropriate, albeit expensive method of providing water to a subdivision] would trivialize the Constitution."  Goldstein, 719 F.3d at 30.

30, 34 (1st Cir. 2014).  To prevail on this claim Najas "must show that he 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"  Id. (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)).  In addition, Najas must establish that the defendants were "motivated by 'bad faith or malicious intent to injure[.]'"  Id. (quoting Rubinovitz v. Rogato, 60 F.3d 906, 911 (1st Cir. 1995)).  Because Najas has failed to sufficiently plead that Pine Hill Estates has been treated differently than any other similarly situated project, his claim must fail.

As the First Circuit recently explained:

> In a class of one equal protection claim, proof of a similarly situated, but differently treated, comparator is essential.  See Cordi–Allen v. Conlon, 494 F.3d 245, 250 (1st Cir.2007).  In particular, "plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  Id. at 251 (internal quotation marks omitted).  They must show that they "engaged in the same activity ... without such distinguishing or mitigating circumstances as would render the comparison inutile."  Id.  Moreover, this requirement "must be enforced with particular rigor in the land-use context because zoning decisions 'will often, perhaps almost always, treat one landowner differently from another.'"  Id. (quoting Olech, 528 U.S. at 565, 120 S. Ct. 1073 (Breyer, J., concurring)).

Snyder, 756 F.3d at 34.  Here, however, in the proposed Second Amended Complaint (Docket No. 51-1), the plaintiffs allege merely that "[a] number of other subdivisions and land use projects have been permitted, approved, and built in the Town of Seekonk in which the Seekonk Water District and/or Bernardo reviewed the plans submitted for such projects[.]"  (Id. ¶ 71).  The plaintiffs then list the names of 10 projects without descrip-

tion, and contend that the defendants did not raise the issue of nitrates, impact on the water supply, potential health risks or the like in connection with any of the projects as they did with the Pine Hill Estates. (Id. at ¶¶ 71-78). The absence of any facts from which the court can determine whether these alleged "comparables" are in any way similar to the plaintiffs' Pine Hill Estates Project mandates that the equal protection claims fail. See Clark v. Boscher, 514 F.3d 107, 114 (1st Cir. 2008) (equal protection claim brought by developers of residential subdivision dismissed where "Court must be able to compare apples to apples" and developers presented the court "with a fruit basket" of different types of allegedly comparable developments). For example, but without limitation, there are no allegations about the size of these developments, or how close these developments are to the town's water supply. The burden is on the plaintiffs to establish the extremely high degree of similarity between themselves and the entities to which they are to be compared. See Rectrix Aerodrome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n, 610 F.3d 8, 16 (1st Cir. 2010). The plaintiffs in the instant case have not met their burden.

The proposed Second Amended Complaint is equally deficient with respect to the plaintiffs' Orchard Estates Project. Therein, the plaintiffs allege only that the defendants allowed the Jacob Hill Estates subdivision in the Town of Seekonk to dead end its water line, instead of looping. (Docket No. 51-1 at ¶¶ 93-96). Again, however, there is no indication of in what ways, if any, the Jacob Hill Estates subdivision is comparable to the

Orchard Estates Project.  Therefore, the plaintiffs' equal protection claim concerning this

Project must fail as well.

Courts are extremely reluctant "to entertain equal protection challenges to local

planning decisions" for good reason.  See Macone v. Town of Wakefield, 277 F.3d 1, 16

(1st Cir. 2002).  Again as the First Circuit explained:

> Every appeal by a disappointed developer from an adverse ruling by
> a local Massachusetts planning board necessarily involves some
> claim that the board exceeded, abused, or "distorted" its legal
> authority in some manner, often for some allegedly perverse (from
> the developer's point of view) reason.  It is not enough simply to give
> these state law claims constitutional labels such as "due process" or
> "equal protection" in order to raise a substantial federal question
> under section 1983.

Id. (quoting Creative Env'ts, Inc., 680 F.2d at 833) (additional citations omitted).  Other-

wise, federal courts would simply become "zoning boards of appeals."  Id. (internal

quotations and punctuation omitted).  In the instant case, the plaintiffs have failed to

allege sufficient facts to raise a constitutional concern.  Therefore, Counts X and XI will

be dismissed.  Since the proposed amended complaint does not solve the problem, the

motion to amend will be denied as futile.  See Adorno v. Crowley Towing & Transp. Co.,

443 F.3d 122, 126 (1st Cir. 2006) ("consent to file amended pleadings 'shall be freely

given when justice so requires,' Fed. R. Civ. P. 15(a), unless the amendment would be

futile or reward undue delay[.]").

   **D.     Substantive Due Process**

In Counts XII and XIII of the Amended Complaint, the plaintiffs purport to allege that the defendants violated their Fourteenth Amendment substantive due process rights. For the reasons detailed herein, these counts fail to state a claim and will be dismissed.

"Where, as here, a plaintiff's substantive due process claims challenge the constitutionality of certain executive acts, the plaintiff must show *both* that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property." Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (quoting Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006)). Acts will be deemed to "shock the conscience" only if they are "truly outrageous, uncivilized, and intolerable," and "the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error." Id. (internal quotations and citations omitted). The First Circuit has "stated with 'a regularity bordering on the monotonous' that to be liable for a violation of substantive due process rights, a defendant must have engaged in behavior that is 'conscience-shocking': 'the substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong.'" Mongeau v. City of Marlborough, 492 F.3d 14, 17 (1st Cir. 2007) (quoting Pagan, 448 F.3d at 33).

In the instant case, the plaintiffs have alleged, at most, that the defendants blindly adhered to their belief that the Project would harm the town's drinking water and create significant health risks, despite persuasive evidence to the contrary. This conduct is not so egregious as to rise to the level of a substantive due process violation. See PFZ Props.,

Inc. v. Rodriguez, 928 F.2d 28, 32 (1st Cir. 1991) ("Even assuming that [the permitting authority] engaged in delaying tactics and refused to issue permits . . . based on considerations outside the scope of its jurisdiction . . . , such practices, without more, do not rise to the level of violations of the federal constitution under a substantive due process label.").[10]

### E.    Intentional Interference with Advantageous Business Relations

In Count XV of the Amended Complaint, the plaintiffs have sued Bernardo individually for tortious interference with advantageous business relations.  (Compl. ¶¶ 207-12).[11]  Bernardo contends that he is entitled to common law immunity for this claim.  This court agrees, as a result of which this count will be dismissed.

---

[10]  Since this court has determined that the plaintiffs have not established a violation of their constitutional rights, there is no need to address Bernardo's contention that he is entitled to qualified immunity from suit under 42 U.S.C. § 1983 or the MCRA.  See Hunt v. Massi, – F.3d – , 2014 WL 6960410, at *4 (1st Cir. Dec. 10, 2014) (quoting Ford v. Bender, 768 F.3d 15, 23 (1st Cir. 2014)) (qualified immunity involves a two step analysis, the first being whether the facts, taken most favorably to the non-moving party, "make[s] out a constitutional violation[,]" and the second being "whether the violated right was clearly established at the time that the offending conduct occurred.").  This court also declines to address the Water Department's contention that the complaint fails to allege the existence of an official policy or custom that causes the plaintiffs to be subjected to the denial of a constitutional right.  Absent a constitutional violation, there can be no municipal liability.  See Holland v. Breen, 623 F. Supp. 284, 290 (D. Mass. 1985).

[11]  "Under the Massachusetts Torts Claims Act, G.L. c. 258, § 10(c), municipalities are not liable for any claim arising out of an intentional tort, including intentional interference with a contractual relationship."  Cachopa v. Town of Stoughton, 72 Mass. App. Ct. 657, 665, 893 N.E.2d 407, 414 (2008).  Thus, any official capacity claim against Bernardo for an intentional tort would be barred.  See Nelson v. Salem State Coll., 446 Mass. 525, 537 n.9, 845 N.E.2d 338, 349 n.9 (2006).  Since, however, Bernardo is being sued in his individual capacity, the statute has no application here.  Id. at 537, 845 N.E.2d at 349.

At common law, "a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption." Nelson v. Salem State Coll., 446 Mass. 525, 537, 845 N.E.2d 338, 348 (2006) (citing, inter alia, Gildea v. Ellershaw, 363 Mass. 800, 820, 298 N.E.2d 847 (1973)). Moreover, Bernardo's "conduct and actions are covered by the rule that '[t]here is every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare.'" S. Boston Betterment Trust Corp. v. Boston Redev. Auth., 438 Mass. 57, 69, 777 N.E.2d 812, 820 (2002) (quoting Foster from Gloucester, Inc. v. City Council of Gloucester, 10 Mass. App. Ct. 284, 294, 407 N.E.2d 363 (1980)).

Even the most liberal reading of the facts alleged by the plaintiffs does not indicate that Bernardo "acted in bad faith, maliciously or corruptly." Gildea, 298 N.E.2d at 859 (city officials entitled to immunity where the plaintiff "has neither alleged nor produced evidence that the defendants acted in bad faith, maliciously or corruptly"). Despite the conclusory allegations of bad faith and malice, the record establishes that the nitrate levels in the drinking water in the Town of Seekonk were of some concern, as evidenced by the monitoring at the Middle School. The potential of "blue baby syndrome" was recognized by the EPA as a potential health risk linked to high nitrate levels. Thus, Bernardo's efforts to highlight concerns regarding the potential for high clean up costs and serious health risks were well within his authority as Superintendent of the Water Department, and did not raise issues which were beyond the realm of possibilities.

Moreover, Bernardo's challenges were made publicly, through appropriate channels, and the plaintiffs were given the opportunity to, and did, in fact, fully respond to Bernardo's concerns. Finally, while the plaintiffs may have been forced to fully support their claim that the proposed Project would not increase nitrate levels beyond those approved by the EPA, they were not obligated to do anything illegal or to provide information beyond that which was appropriately considered in connection with a real estate development project. In short, the plaintiffs have failed to allege any facts to support a conclusion that any "interference" by Bernardo was improper. See S. Boston Betterment Trust Corp., 438 Mass. at 69, 777 N.E.2d at 821 (where Mayor's involvement with potential development of convention center was not improper, and mayor did not act "in bad faith, corruptly, or with malice," claim of interference with actual and potential business deals fails). For these reasons, Count XV will be dismissed.

The purpose of the common law immunity is "to allow public officials to speak freely on matters of public importance during the exercise of their official duties." Mulgrew v. City of Taunton, 410 Mass. 631, 635, 574 N.E.2d 389, 392 (1991). This is precisely what Bernardo did. The fact that, according to Najas, Bernardo was seriously mistaken in his analysis does not raise his speech to a level of a tort for which he may be held liable under Massachusetts law.

# IV. CONCLUSION

For all the reasons detailed herein, defendants' Motion for Partial Judgment on the Pleadings (Docket No. 36) is ALLOWED, and Counts I-IV, X-XIII and XV of the Amended Complaint are dismissed. Plaintiffs' Motion to File a Second Amended Complaint (Docket No. 50) is DENIED as futile.

       / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge